The first case for argument this morning is 17-2218, Vivint v. Alarm.com. Mr. Stern. Good morning, Your Honors, and may it please the Court. The Board committed legal error in its overbroad, broadest reasonable interpretation by reading out three critical claim features. These features are remotely accessing the computer server, remotely configuring the user-defined message profile, and user-defined message profile having outgoing message routing instructions in the plural. So let me take each of these read-out claim features in turn. Remotely accessing the computer server. The Board's final written decision found that accessing the computer server is synonymous or coextensive with remotely configuring the user-defined message profile. Now this has three legal errors. First, it equates accessing with configuring. Second, it conflates computer server with user-defined message profile. And third, it construes remotely as merely separate, not indirect or remote. Each mistake is reversible error. The Board's final written decision made a fourth mistake by reading out the plurality of routes recited in the user-defined message profile having message routing instructions. Can I ask you, just going back to, I don't know which number on your list this was. This is on configuring. Your view is that it's two steps? It has to be, Your Honor. The way the claim is written, the way the invention is described in the specification, it has to be two steps. Okay, well the first argument I think, and there's so many issues in this case, correct me if I'm confusing this with another one, but I think that there's an initial argument about whether you waived that. We did not waive that, Your Honor. We did not waive that issue. Well, did you raise the construction? I mean, now you're asking for a claim construction, right? Was that claim construction issue brought to the Board? Yes, we did, Your Honor. We argued that the access and the configuration were different. And by definition, I'm just reading the claims in their literal language. Okay, I think the other side, or maybe the Board, what they say is the arguments you made that you point to here as being the non-waived arguments were in connection with discussing, was it Shetty, the piece of prior art, and it wasn't made as a real claim construction argument. Well, Your Honor, the point is that the Board in analyzing the claims and construing the claims looked at it through the lens of Shetty and made specific findings that these two terms are coextensive. And we have argued throughout these proceedings that they're not. And it makes no logical sense that they be coextensive. This is important because, as I read it, the Board did not make a claim construction analysis of access. It simply said, does Shetty disclose that, right? The Board... So our review is for substantial evidence. Yeah, well, no. But the point is that they essentially, by conflating these two terms, is meaning the same thing. And by the way, you have to read the access in light of the whole claim. And access is to the computer server, and configuration goes to the user-defined message profile. They're separate parts. Well, wait, wait, wait. The claims recite accessing to remotely configure, right? No, the actual claim language, Your Honor, is... If we look at Claim 22, it says... Are we at the 601? Yeah, I'm looking at the 601, Pat, Your Honor. Sorry about this. Okay. So if we look at Claim 22, it says, a computer server in remote... Let's see. The language is... Right? I mean, it says, a user being capable of remotely accessing said computer server via said user intersafe to remotely configure. That's the language I was referring to, if you have... Yeah, well, the language... The language... That's what a few ellipses is. It's talking about accessing in order to remotely configure, right? Well, Your Honor, if we would look at Claim 1, it says, enabling a user to remotely configure or modify a user-defined message profile containing outgoing message routing instructions. Yeah, I know, but we're talking about the two words, the two terms, accessing and configuring, and we're trying to figure out whether there's a two-step or a one-step. So the claim that you first look to and I've been looking to is Claim 22, which uses those terms, both of those terms. It says, a user being capable of remotely accessing said computer server, this is Claim 22, via said user interface to remotely configure a user-defined message profile. So the... The point being, just so then you can respond to my thing, is I think what the board concluded was the only reason a user accesses a database is to configure the data in that. Yeah, I agree. That's what the board said, but it's wrong. It's wrong in the way that the specification shows the invention, and it's wrong from a general proposition of how computer systems work. The invention, as described, says that the, and this was in the prosecution history, that you have to have a, you know, a PIT in order to access the computer system, and then in order to remotely configure the user-defined message profile, which is contained in this larger computer system, then you can do this remotely. But in order to qualify and to authenticate the user, you have to be able to have an access step that's separate and distinct from what you want to remotely configure. Think about this theoretically. This system was a major breakthrough, Your Honors, in 1999 when this case was filed, because it allowed a user of a security system anywhere in the world to receive notifications, to specify who would get notifications based on what events that would occur, and also to be able to remotely configure or reconfigure or modify these user profiles. And the important point here is that they didn't have to go to a central system like the one that's described in Shetty, where you have predefined user profile and a predefined event profile. And so accessing could, just to give you an example, accessing could be you get into the system and you look at the data and say, I just got a notification. This particular air conditioning unit is not working. But that doesn't mean you're remotely configuring anything. The board relied on extrinsic evidence to conclude that Shetty, that access encompasses reading and writing, the ability to both have, to read and to write. And so why wouldn't that mean that once you access, you then can configure? Well, I mean, first of all, we dispute the reading of Shetty as to the accessing of the three databases. The language that you find in Shetty that is in dispute, the two back-to-back sentences, talk about accessing the user profile and the event profile. But then it goes on and says that you can input data to the machine database. Now, the point here is that you have predefined user profile and event profiles in Shetty. There's no question about that. It's used, predefined is throughout Shetty. And therefore, that entails that you can read what data is in those two databases. But it doesn't mean you can write anything into those databases. And it makes no logical sense in Shetty that you'd be able to write data in there because the whole point of the Shetty system is to monitor what's going on with the equipment at that construction site. So this isn't, though, a claim construction dispute. This really turns on how one reads Shetty, whether or not you view Shetty as providing access plus modification, right? No, I beg to differ, Your Honor. This is all about claim construction. This is a situation where the board improperly read Shetty onto these claims and in the process impermissibly, as a matter of law, removed claim terms, critical claim terms, that were the whole basis, the whole basis of why these claims were allowed over the prior art. If you look at the prosecution history of this case, you see that these limitations that I'm talking about were added to get over the prior art. Shetty's the old stuff that's discussed in prosecution. Okay, so just before your time runs out, let me turn to, I think this was on your list, which is the instruction versus devices, the multiple instructions issue. Yes, Your Honor. And that's another, I mean, what seems to permeate some of the arguments here is that there's an initial confusion as to what was really posited by the parties or whether it was claim construction. So here the confusion I have through the briefing is whether or not your argument is for multiple constructions or for multiple devices. And it seems to me that you are arguing for multiple devices. The reality is that that's the position you're on, right? Do you understand my question? Yes, I do, Your Honor. I think, again, what these claims require and demand is that you have the capability of having two or more routing instructions from a user-defined message profile, that's what's in the claims, that you have the capability to allow you to specify which user or users get which notification messages on which of their devices, two or more devices or two or more users or two or more routing routes. It's this robust configuration that you have in this claimed invention. Maybe I'm wrong, sorry, but you said twice, two or more. Isn't the claim language at least one or no? No, but what we're talking about is we're talking about message routing instructions. And so the message routing instructions in the user-defined message profile is a capability requirement. It's a capability requirement, and that's why it says at least one device. But you have to be capable of specifying at least two routing instructions. Okay, so where in your patent owner response did you make that argument? I believe, Your Honor, we made it throughout in terms of the instructions being plural. Again, you have to, you know, my point is going back to... But do you appreciate that, at least to my understanding, there's confusion at least? If not, what you're talking about is multiple devices, not instruction versus instruction, right? Is that not what you're getting at? It's not whether there's one, whether instructions are plural or singular. So that's my, I have the same concern that Judge O'Malley has with respect to why you preserve that. Well, Your Honor, the claims are in plural. The instructions in the claims are plural, so they have to be plural. We're held to that, and it's that capability that I've been arguing about the instructions and that they can send... But isn't there a difference between whether instructions are singular and plural, which I understand was the claim construction before the board, and whether your position now that instructions have to be to multiple devices? To me, those are two separate things, right? Well, I mean, I think we're confusing the fact that when you're talking about an instruction, a single instruction, you can be sending it to one or more devices. But the point of the claim is that you have to have the capability of multiple routing instructions, plural, so that depending on what each one of those instructions can do, that you have to have that capability in order to have the robustness. But why, if you have capability for instructions, does that necessarily mean that we're talking about you have to have the capability for multiple devices? Isn't that, aren't there two different things? No, because we say that the instructions route information to who you want to route it to, for what event, and to which device. And these routing instructions define this. They are remotely defined by the user so that the user can configure this system so that the designated devices get the designated notifications for the designated events. And this is what makes this invention so important, is because from anywhere in the world you can reconfigure or configure your system so that you can change things without having to go to a central site like you have in Sheddy. I realize my time is over, but have I answered the question? Yes. Why don't you reserve your time. We've got a lot here today. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. With respect to configuration, Your Honors, there was no debate below that configuration refers to writing data into the database, into the message profile. There was no claim construction issue on that. It was, as Your Honors noted, an issue applying to Sheddy. Indeed, the Board relied on four dictionaries to determine that the word access means read and write. That's the natural meaning of accessing a database. It would be a strange computer system indeed to be one that allows no writing of data, only reading of data. Is there anything in Sheddy other than the use of the word access, to which the Board then turns to dictionary definitions, that you think point to users being able to modify the information in the user profile? Well, yes, Your Honor. As the Board noted, the system was configurable in Sheddy. It was customizable. It noted in Sheddy that the system had to be adaptable to the needs of different users, and it does refer to writing machine information about the mobile machines, which was, as the Board noted, was not limited to writing that data into the machine database. It generally could be written into the system, and as the Board noted, information about the machines would be necessary to associate machines with user profiles. Is there a difference between event data, which is expressed and mentioned in Sheddy, and user profile database data? Yes, there is, Your Honor, and Figure 1 shows there are two separate databases, one for there's a user profile database and there's an event database, and Figure 1 shows a user interface with lines connecting it to both those databases. And I think the Board noted that information could be accessed, meaning read and write, in the event database, and Figure 1 would illustrate that same kind of access was provided, same illustrations provided. And before the Board, your friend was relying on Figure 4, not Figure 1, right? I think Figure 1 and Figure 4 as well, Your Honor. And Figure 4 relates more to the remote access part, and Figure 4 clearly shows that there's a database workstation 406 and a so-called third workstation 410, and both of those, as described in Sheddy, particularly at column 4, lines 11 to 14, both of those would have the data manager 100 on them. And Figure 4 and the description that goes along with it shows remote workstations 420 and 422 having remote access to the third workstation 410, so they would have access, meaning read-write capability, to the data manager, which includes the user profile database, which, as Sheddy describes, is stored on that third workstation 410. So that, Your Honor, we submit fully discloses read-write access, namely configuration, for the user profiles. What's your response to the argument on the other side that what the Board really did, even if it didn't purport to do claims instruction, is to collapse the terms access and configure into one? Well, as noted, Your Honors, the claim language, checking claim 22, for example, refers to access to the computer system to configure. Access, again, meaning read-write just for ordinary usage, and configure would be, as I read these claims, essentially a subset of access. You have to read and write in order to configure, access the database with read and write access, to read and write into the message profile to configure. So it's essentially coextensive, or as the Board found, or configure is a particular application of accessing the database. So there's really not any light space between access and configure, the way these claims use those terms. If I may, Your Honors, move to the other construction issue raised by Vivint. Having to do with instructions, plural. There, Your Honors, no doubt Vivint asked for a construction in that case, and asked for that the construction include the word instructions, plural. And indeed, the PTAB gave that construction. The PTAB's construction includes the word data record, including instructions. So there's no claim construction dispute left, and Vivint disclaimed in their reply brief on this appeal that they were arguing for multiple devices. They said, no, no, no, we're not arguing multiple devices, we're arguing multiple instructions. And coming to what really is the rub on the instructions argument, Vivint made no argument in the inter partes proceeding to the effect that Shetty did not disclose instructions. The only argument they made about Shetty and instructions was in their preliminary response, which per the standard scheduling order issued by the PTAB, and this is at appendix page 499, arguments not made in the patent owner's actual response, their response on the merits, are waived. They only made this argument about instructions and Shetty in their preliminary response. Did the PTAB find the issue was waived, or did it address it? It didn't address it because it wasn't raised in the merits phase of the PTAB proceeding. Now, Vivint argues vociferously in their reply, no, no, no, we didn't waive it. They cite a number of pages of their papers. All of those citations are to their preliminary response, and as this court held in duvasive, something raised in the preliminary response but not raised in the merits response is waived. So the Shetty issue with regard to instructions is simply waived, even if it were not waived, Your Honors, as we argued below, Shetty's user profile database undoubtedly discloses multiple user profiles and multiple instructions, but the board didn't even go to the user profile database. They focused on a single user profile and found that disclosed instructions, and even if Vivint's arguing there have to be multiple devices to be multiple instructions, as the board noted, Shetty said a single user profile can direct messages by a mode or modes of communication. So there can be multiple devices that receive messages under Shetty, and indeed Claim 13 of Shetty says send messages to at least two different communication devices, such as fax and pager and so forth. So Shetty actually expressly discloses sending messages to at least two devices from one single user profile. Is it possible that access could mean one thing under Shetty and a different thing under the patent, and therefore there's the question of whether or not by interpreting Shetty without reference to the language of the patent, that the board went astray? I don't think so, Your Honor, respectfully, in that the board didn't actually just construe Shetty divorced from the disclosure of the patent. The board went through the 601 patent and other patents at issue carefully and pointed out that the patent uses the term access and configure. Access and configure uses them together. Access to configure uses access with configure almost every time it refers to one or the other in the specification of the 601 patent, and in context it's clearly saying, as the board noted, you have to get access to the database to read and write data, and it's really coextensive as used in the patents in suit. Do you want to move to the cross appeal before we run out of time? Yes, Your Honor, thank you very much. Yes, turning to the cross appeal, Your Honor, I wanted to refer principally, if I may, to the communication device identification code issue there and refer to the 123 patent. Let me see if I can find that in one of the papers. Your Honor, the fundamental issue on the communication device identification code is one of claim construction and how the board construed that term. The ordinary meaning of communication device identification code we would submit and we believe expert testimony was in accord with this, is simply an identifier for a communication device. So the board said it consists of two codes, right, and identified those two codes, and you're saying that was too narrow and it should have also included e-mails and telephone numbers and so forth? Yes, precisely, Your Honor. Well, the board, to be a little bit more precise, the board gave two examples of ID codes. What the board essentially said is it has to be the CDIC or communication device identification code. It has to be some sort of unique identifier. It has to be the hardware, it said. Maybe, perhaps a hardware identifier or serial number. Those were examples that the board gave of what kind, and they really were adopting Vivint's argument on this, where Vivint argued that the communication device identification code, by plain meaning, by ordinary meaning, by its very nature, has to be something unique in all the world, something that would uniquely identify, like a serial number does, any device from every other device in the world. Well, that is not what the claim says. The word unique doesn't appear in the claim. And, in fact, all that appears in the claim is identification code of a communication device, something that identifies. We submitted below, and I would submit here, a telephone number, for example, identifies a phone device. My cell phone number identifies my cell phone. That's clearly what it does. I don't think there's any debate. But don't the patents explicitly refer to cell phones having serial numbers? It refers to these MSNs and MINs as serial number type identifiers used in cellular communication. But this was another place where the board went astray, Your Honor. The board, let me back up for a moment. The specification of these patents talks about ESN and MIN only in connection with a very specific type of communication. They give the branded examples of some ERAS system and a cellimetry system, which are two systems described in other patents, prior art patents, which are referenced in columns 5 and 9 in this 123 patent, for example. And those are used to communicate from the remote monitored equipment. Each piece of remote monitored equipment has an interface unit on it, which has to communicate to the computer server. So what can you tell us is in the specification that helps your argument? Well, a specification that helps our argument, Your Honor, is the following. First of all, in the claim language, it says you need an identifier for a communication device. And it provides a little more context than that. It also says that user profiles are configured, sorry, message profiles are configured by the user, and communication device identifier codes are also configured in the message profile by the user. In the specification at columns 3 and 4, and then in more detail at column 11, lines 48 to 60, it talks about configuration of the message profile. It says the contractor configures the message profile by specifying who gets what messages and by what means, specifically by putting in phone numbers to identify phones or pagers or text messages, and putting in what they call internet addresses, which means e-mail addresses, to identify e-mail. That's what gets configured. But doesn't the identification code have to be something that could describe both an interface unit and a communication device? I'm not sure how a telephone number can do that. Well, there's nothing at all in the claims, Your Honor, that says the communication device ID code identifies an interface unit. Quite the contrary. It's associated with a user-defined communication device. It's not connected to interface units at all in the claims or in the specification. And one other thing I would mention, Your Honor, as to the board's interpretation, they relied very heavily on figures 12 and 13 in the 123 patent. And 12 and 13 are described in columns 13 and 14 in the specification. The board mistakenly thought that table 721, shown in figure 12, somehow related to a communication device ID code. And that really is just completely wrong. It's a bit laborious to do so, but if one reads from the bottom of column 13 through the bottom of column 14, what it describes is table 720 at the top of figure 12 is a database table that lists all possible outgoing messages. And the system will go through this table when it has to send outgoing messages and identify the method of communication. And the way it does that is by identifying the message delivery ID, which is the first entry in table 720. And that keys to the tables listed in figure 13, which are tables about communication devices, user-defined communication devices like fax delivery or pager delivery or phone delivery. That's how the communication method is accomplished, is through figure 13, and the phone numbers and so forth identified to the communication devices there. At the bottom of figure 14 is the one and only reference to table 721, which is the key table for the board. Only one reference in the entire patent to table 721. And what it says there is when the system is putting together an outgoing message, it gets information, for instance, from the fax delivery table to send a message to a fax communication device. And then it gets also, it says, along with the equipment location, make, model, and serial number found in device location table 721. So what it's getting is equipment. What this patent uses the word equipment to refer to always is the remote monitored equipment. Can I interrupt you because your time is running out, and I just have a quick question before you conclude, and that's with regard to your motivation to combine theory and to leave that, because it was a little disturbing to me because, as I understand, so you can tell me why I'm wrong, this argument deals entirely with claim 19. And everything that I could discern that you pointed to in terms of what you had done on the record with regard to a motivation to combine had to do with entirely different claims talking about different claim limitations. So am I right or wrong about that? It seems like the arguments that you're pointing to in terms of motivation go to claims 7 and 28, those limitations that are different than claim 19. So that's what I read. I understood your brief as pointing to for the motivation that you disputed the board with. The board found no motivation to combine.  And I couldn't find that the arguments that you made for these two claims applied to claim 19, or that you made them a connection to claim 19. Your Honor, if I may, check the papers and come back on my rebuttal time to respond to that. I'm afraid I don't have that at the tip of my tongue. Can I then move you to your other class appeal error, whether Britain discloses the normal status message? It seems to me, or at least this is the way I read it, that Britain just discloses that the link between the system and the home computer, whatever you want to call it, is working, not that the, you know, let's just say AC unit. That it's actually working. And Shetty only sends error messages when there's error messages. So how do the two of them disclose an actual periodic status okay message? Your Honor, the two of them, we argued that the two of them combined would operate as follows. Britain discloses periodic messages that are heartbeat messages, just like what's described in the 601 and so forth patents. Well, it does, but it doesn't describe, isn't the key difference is whether the telephone link is working, not whether the underlying system is working. And that seems to me to be key here. Well, it is to a degree. In the 601 patent, for instance, the normal status message is simply a message that comes through periodically. And it's interpreted on the server side as if it's received, everything must be okay. Lack of receipt of that message would indicate an exception condition. And the same thing would happen in Britain. Lack of receipt of a heartbeat message indicates there's some problem. And the combination of Shetty and Britain, we argued, would operate in that same way. But isn't the problem that you could get that message in Britain saying the telephone connection is okay, but still have an underlying problem with the system? That certainly is the issue that the board identified, Your Honor. There are several nuances here. One is that there are eight claims for which, and we've mentioned them in our briefing, for which that's not an issue at all. There is no reference to equipment in these eight claims, and the board held those not unpatentable also. And also for a number of the claims, the interface unit is part of the equipment that's monitored, and the interface unit is the same thing as the communicator in Britain. And the communicator, by being able to send a message, is indicating that it's functioning properly. If it weren't functioning properly, it wouldn't be able to send the message. I see my time is almost up. All right. We'll reserve a couple minutes for rebuttal. Thank you. Thank you. Your Honors, in terms of waiver, I direct your attention to our Patent Owner Response Act. Which waiver? Which term are we talking about? We're talking about the waiver of the message profile issues. And if you look at our Patent Owner Response at page 34, or actually 32 through 34, which is in Appendix 0556 through 0558, clearly we did not waiver. We did not commit waiver, nor did we. And we also, and we agree with counsel, that we raise this issue in the POPR at Appendix 398 through 400. But I have very limited time, and I wanted to try to explain again why what the Board has done here is completely impermissible as a matter of law. They have, in effect, used Shetty to construe the claims and do their claim construction. And by that, they can hide now behind substantial evidence. Now, what is wrong with this is claim construction is a legal issue. And by taking... Except when it relies on extrinsic evidence. I'm not sure why I see this matters at all, whether this is claim construction or looking at Shetty, because they went to a dictionary definition of access. And if they had done that in the context of a claim construction, that would have been extrinsic evidence that we would have still applied a substantial review standard to. Wouldn't it? Okay, Your Honor. For purposes of analysis, let's just say that... Let's look at this word access versus configure, whether it's substantial evidence or de novo review. They're not the same terms. They're used separately in the claims. They're used separately in the spec. Shetty clearly states over and over again that the user database 106 and the event database 108 in Shetty are predefined. Your Honors, I direct your attention, if we could, to the Shetty patent. And if we look at column one, line six... It is essentially what you're saying is even though the board found common dictionary definitions of access that includes configure, which would normally be substantial evidence, your patent has come up with a new way to describe access and configure and that you've somehow coined those terms in ways that are different from these dictionary definitions. No, I'm not saying that, Your Honor. The dictionary definitions go to access, not configure. Well, the dictionary definitions, I think, go to the notion that access includes configure. Right. But you have to read our access and configure in light of our specification under the BRI. Otherwise, it's unreasonable. And what I'm saying is if you look at Shetty, it says that these two databases, 106 and 108, are predefined, pre-configured. If you look at column one, line 63 and 65, and also column two, lines 58 and 59, it says that databases 106 and 108 are pre-configured. So therefore, access, as used in Shetty, means read only. They're pre-configured. You're reading the data. And in our claims, when you configure, you change the profile, the message user profile. When you access the computer system, you access it so that you can see what's going on in the computer system. It doesn't mean that you are accessing it to reconfigure the system. You are accessing it to see the operation of what's going on in the system. Moreover, the board conveniently reads out the limitation of remote from the claims. By going to figure one, it points to the dotted line box around the event manager 100 and says that because the- You know, you don't have very much time left. I know you want to get through this, but I think I'd like to hear about the communications ID code issue. Okay, sure. Because it doesn't seem to me like there's very much in the specifications to support the board's definition. Well, Your Honor, I think we need to look at the exact language of the claim. And the identification code means that you have to uniquely identify the device that you're sending the message to as the way the claim is written. And therefore, if you just send it to a cell phone number or to a fax number or to an e-mail number, then you don't know who's going to get the message and which device is going to receive the message. You could send an e-mail to your e-mail address, and it could come out on five or six different devices. The purpose of this claim is to identify which device or devices are going to receive the message. Where in the specification does it explain any of that? Because this seems to me to be kind of contrary to what the whole point of this is, which is you can have this system flexible and notify people in a bunch of different locations, and that they can input this data themselves. I mean, the likelihood of somebody digging in to figure out what the specific identification number for their cell phone or the identification number for their computer as opposed to a number or an e-mail address seems very unlikely. Well, Your Honor, I believe that— I mean, if I want to configure this system to give me error messages on my home phone, my work phone, my e-mail address, and stuff like that, I don't want to have to go in and dig out the ID numbers associated with the machine. I want to put in the cell phone number and the e-mail address. Yeah, and that would not be an infringement of the claim. I mean, the point is the advance here is that you designate the particular communication device you're sending it to. That's the point. There's nothing in the specifications that describes in particular what a communications ID code is. Well, the board interpreted the term. It looked at Vivian's declarance, Mr. Denning's testimony on the issue, which is found at Exhibit 210 in Paragraphs 128 and 132 that they cite to for this finding. But doesn't the specification itself refer to telephone numbers as examples of unique delivery addresses? Well, it indicates that you can deliver the messages to those using those mechanisms. But this claim is more specific, more confined than that. So a system – so, I mean, does any commercial embodiment actually ask for specific ID numbers associated with the phone rather than more general phone numbers or e-mail numbers? Yes. I mean, what you're saying is that if all the system does is ask for e-mails or phone numbers or the like, that this can't infringe. Well, that's the way the claim is written, yes, because you have to have the ability to uniquely identify where you're sending the message to. And a phone number or an e-mail or something like that doesn't uniquely identify under your interpretation. So you can't assert this against a system that just uses phone numbers or e-mail addresses or something like that. Well, that's the – I mean, the claim requires a – Is that a yes or no? I mean, I – Yes. Okay. Yes. So I – One final point, because we didn't see it at our time. One final point is, Your Honor, on the issue – the requirement of remote, which goes to the central heart of this invention. The Board cobbles together this argument that because Figure 1 shows the user interface 110 outside this dotted box, it's separate. And therefore, because it's separate, it's remote. And there's nothing to support that conclusion. The whole Shetty document points to a centralized system, and it's preconfigured, and therefore, this remote configuration and remote access cannot be achieved. Thank you, Your Honors. Thank you. Well, the rebuttal is obviously limited to whatever your friend said about your cross-appeal. So that was very confined. So if you have a comment on that, go ahead. If not, we'll close it up. I was going to provide the response to the question Your Honor had provided, and that was – it had to do with motivation to combine Shetty and Levesque. And I would refer, Your Honor, to appendix page 305, where we raised – discussed that. Actually, page 304 and 305, we talked about in the petition about motivation to combine. And that's claim 19. As to claim 19, it's – and also, I guess, over to page 310 in the appendix, where we specifically charted claim 19, and that's all connected to the motivation to combine on 304 and 305. With respect to the counsel's arguments just now, I think the one thing I would note is there's absolutely nothing in Shetty that says that it's preconfigured and frozen for all time. It simply doesn't say that. Thank you. Thank you, Your Honor. We thank both sides, and the case is submitted.